In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1853

RENAE EKSTRAND,

*Plaintiff-Appellant,*

*v.*

SCHOOL DISTRICT OF SOMERSET,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08 C 193—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 14, 2009—DECIDED OCTOBER 6, 2009

Before, EASTERBROOK, *Chief Judge*, and BAUER and
EVANS, *Circuit Judges*.

BAUER, *Circuit Judge.* Renae Ekstrand sued her
former employer, the Somerset School District, claiming
that the school district failed to accommodate her
seasonal affective disorder and constructively dis-
charged her in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12112. The district
court granted summary judgment to the school district

on both counts. We have reviewed the district court's decision de novo; finding error, we reverse in part.

## I. BACKGROUND

Renae Ekstrand taught successfully at Somerset Elementary School from 2000 to 2005. For the 2005-2006 school year, she requested a move from kindergarten to the first grade, and the school reassigned her to a first-grade classroom lacking exterior windows. Ekstrand told the principal that she had seasonal affective disorder, a form of depression, and would have difficulty functioning in a room with artificial light rather than natural light. She repeatedly requested an alternate room with natural light before the school year began, throughout the first five or six weeks of the school year as her health declined, and during the following month while she was on disability leave. During this time there were two alternate rooms available: the room of Ann Jacquet, a first-grade teacher willing to switch with Ekstrand; and an empty room being held open for a possible additional third-grade section pending the school board's approval.

Ekstrand began by identifying the lack of natural light as an issue that would impair her ability to function, and soon identified other issues that exacerbated her symptoms of seasonal depression, including noise distractions from the adjacent commons area, inadequate ventilation, and the untimely manner in which the school district installed various educational necessities such as appropriate light bulbs, bulletin boards, a map, a

desk, an overhead projector screen, a locking cabinet, and a nameplate.

The school district worked with Ekstrand to remedy these issues but did not reassign her to a room with natural light despite Ekstrand's repeated requests. After the school year began, Esktrand began experiencing fatigue, anxiety, hypervigilance, tearfulness, racing thoughts, and trouble organizing tasks. Her anxiety and depression worsened and she began experiencing new symptoms about which she informed the school district. By late September 2005 and through the time she began her medical leave on October 17, 2005, Ekstrand suffered from significant inability to concentrate, organize her thoughts, retrieve words, make decisions, and focus on the needs of her students. She also experienced hypersomnia, racing thoughts, panic attacks, uncontrollable crying, inability to eat, and thoughts of suicide.

On October 17, 2005, Ekstrand sought medical attention. Her doctors placed her on medication and advised her to take a leave of absence for the remainder of the semester, about three months. Twice during her leave she repeated her requests for a room switch, once in an October 24 letter to the superintendent and again on November 14 when she met with the superintendent in person.

Ekstrand's depression continued to worsen and she began suffering post-traumatic stress symptomology. She became unable to return to Somerset Elementary School for the remainder of the 2005-2006 and 2006-2007 school

years, but she began teaching at South Dakota State University in 2006, finding it significantly less stressful.

On February 28, 2008, Ekstrand initiated this case against the school district in state court under the ADA, claiming failure to accommodate and unlawful discharge. The school district removed the case to federal court, engaged in discovery with Ekstrand, and moved for summary judgment.

The district court granted the school district's motion for summary judgment, holding that the school district did not fail to accommodate Ekstrand's disability because it "engaged in the interactive process and addressed plaintiff's complaints by making changes aimed at reducing her stress"; and that the school district's conduct was "not severe enough to create the type of abusive environment that has been found to amount to a constructive discharge." 603 F. Supp. 2d 1196, 1210 (W. D. Wis. 2009). The district court entered summary judgment in favor of the school district on March 3, 2009, and Ekstrand timely filed this appeal.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in Ekstrand's favor. *Winsley v. Cook County*, 563 F.3d 598, 602 (7th Cir. 2009). Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that the school district is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c).

**A. Failure to Accommodate**

To survive the school district's motion for summary judgment on her failure-to-accommodate claim, Ekstrand needed to present evidence that, if believed by a trier of fact, would show that (1) she is a qualified individual with a disability; (2) the school district was aware of her disability; and (3) the school district failed to reasonably accommodate that disability. *See, e.g., King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008). Ekstrand satisfies all three elements.

First, Ekstrand presented evidence that she was "disabled" and "qualified" under the ADA from late September 2005 to at least somewhere between November 30, 2005, and January 3, 2006. Evidence from Ekstrand's doctors Potek and Erickson and other witnesses and documents show that Ekstrand was disabled beginning late September, when her mental health condition became sufficiently serious to substantially limit her teaching ability. The district court also found that Ekstrand adduced evidence that she was qualified in that she otherwise could have performed her essential job functions as late as November 14, 2005, had she been provided a room lacking the various stressors that exacerbated her seasonal affective disorder. 603 F. Supp. 2d at 1208. But since Ekstrand may have been well enough to return on November 14, as the district court found, the record also suggests her ability to return at least as late as November 30, because two notes by her doctor indicate that her condition improved during that time. *See* Potek Outpatient Clinic Notes of November 17, 2005,

and November 30, 2005. Not until January 3, 2006, does the record indicate Ekstrand's absolute inability to return to work. *See* Potek Letter of January 3, 2006. The record also indicates Ekstrand's willingness to return to work during all times she was able. Thus, Ekstrand presented evidence that she ceased being a qualified individual with a disability no earlier than between November 30, 2005 and January 3, 2006, not on November 14, 2005, as the district court found. Moreover, Ekstrand may have remained a qualified individual later still because Ekstrand presented evidence that the school district was responsible for aggravating her disability. But we need not decide whether a person whose disability is aggravated by an employer ceases to be qualified under the ADA once the disability has grown sufficiently severe. Nor must we decide whether Ekstrand's disorder precluded her from being qualified under the ADA given her unique role as a teacher of impressionable first graders. *See* Judge Evans' concurring opinion below. It is enough in this appeal from summary judgment to conclude that Ekstrand demonstrated a genuine issue of material fact regarding whether she remained qualified through the end of November.

Second, Ekstrand presented evidence that the school district was aware of her disability from late September onward. Indeed, this evidence was so compelling that the district court found "no real dispute." *Id.* Whereas the school district was aware of Ekstrand's disability, however, it was unaware of any evidence that natural light is a necessary treatment for seasonal affective disorder until November 28, 2005, as discussed more fully below.

Third, the critical issue on this appeal is whether Ekstrand presented evidence that the school district failed to reasonably accommodate her. To establish this element, Ekstrand must have presented evidence showing not only her attempt to engage in an inter-active communication process with the school district to determine a reasonable accommodation, but also that the school district was responsible for any breakdown that occurred in that process. *E.E.O.C. v. Sears*, 417 F.3d 789, 797 (7th Cir. 2005). When there is a communication break-down, we are required "to isolate the cause of the break-down and then assign responsibility." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer. The communication process becomes even more difficult in a case involving an employee with a mental disability, because any necessary accommodation is often nonobvious to the employer. Thus, our cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonable-ness standard to provide a specific modest accommodation the employee requests.

For example, in *Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000), the case Ekstrand principally relies on

for her argument, Pl. Reply at 7, a plaintiff employee suffered from depression and other psychological disorders. She showed her employer a doctor's note recommending a switch from the night shift to the day shift in order to ameliorate her condition and enable her to perform her essential job functions. When her employer refused to provide the shift transfer, an accommodation we found would have imposed no undue hardship on the employer, "it flunked its obligations under the ADA. In the face of Gile's repeated pleas for a shift transfer, United refused her request for a modest accommodation, then did nothing to engage with Gile in determining alternative accommodations that might permit Gile to continue working." *Id.* at 373. Likewise, we reversed summary judgment in *E.E.O.C. v. Sears*, 417 F.3d at 808, where an employee had provided a doctor's note indicating that her neuropathy and diabetes could be ameliorated only by avoiding walking long distances or for prolonged periods; and we reversed summary judgment in *Bultemeyer*, 100 F.3d at 1287, where an employee had provided a doctor's note indicating that his bipolar disorder and schizophrenia could be ameliorated only via a transfer to another school. In sum, an employer may not be obligated to provide a specifically requested modest accommodation unless the employer is made aware of its medical necessity to the employee. Indeed, the language of the ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's precise limitations. *See* 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to

the *known* physical or mental limitations of an otherwise qualified individual with a disability" (emphasis added)).

What an employer knows is limited by the evidence the employer receives. On November 28, 2005, Dr. Erickson notified the school district's workers' compensation claims representative of "the importance of natural light for individuals with a history of this disorder" and that "Mrs. Eckstrand's current episode of depression was most likely directly related to a change in her work location, to a room lacking any [exterior] windows." Erickson Letter of November 28, 2005. Before Erickson's letter of November 28, 2005, Eckstrand never provided the school district with evidence other than her own conclusory remarks that natural light was necessary to accommodate her, e.g., she never explained that her doctor had advised of the necessity of natural light. Nor is natural light therapy so widely known as a necessary treatment for seasonal affective disorder that it should have been obvious to the school district before November 28. Ekstrand thus presents no evidence that the school district knew natural light therapy was the only way to accommodate Ekstrand before November 28.

Indeed, before November 28, Ekstrand identified *various* classroom conditions that exacerbated her seasonal depression to the point of being unable to work, including problems with the lighting, noise, and air circulation. Ekstrand Letter of November 24, 2005, at 4. The school district took accommodating steps to resolve each of these issues within less than two months, before Ekstrand went on sick leave. It took these steps to

avoid the costs of switching and readjusting rooms. It took the steps in good faith, as Ekstrand presents no evidence of maliciousness or other improper motive. And most importantly, it took the steps alongside no evidence that natural light was crucial to alleviating Ekstrand's seasonal affective disorder. In sum, Ekstrand presents no evidence that the school district acted unreasonably in accommodating her disability before November 28, 2005.

But on November 28, when Ekstrand may have been a qualified individual under the ADA, Ekstrand informed the school district through her psychologist that natural light was the key to her improvement. Once aware of natural light's medical necessity to Ekstrand, and having been informed by Ekstrand only two weeks earlier that she was willing and able to return to work in a classroom with natural light, the school district was obligated to provide Ekstrand's specifically requested, medically necessary accommodation unless it "would impose an undue hardship" on the school district. 42 U.S.C. § 12112(b)(5)(A).

Little hardship would have been imposed in providing Ekstrand an available classroom. Had the school district accommodated Ekstrand with Jacquet's room, it would have experienced costs associated with switching the items in the two rooms and with performing any necessary readjustments specific to the teachers' respective curricula. Or had the school district accommodated Ekstrand with the empty room, it would have experienced the costs of moving Ekstrand's items, plus the costs of switching and readjustment due to the room

being needed for a new third-grade section reduced by the probability that creation of the third-grade section would not occur. We think these admittedly nonzero costs are modest and that Ekstrand presented sufficient evidence for a jury to find them required under the ADA's reasonableness standard beginning November 28, 2005, when the school district knew that a room with natural light was necessary to accommodate her. We therefore disagree with the district court that no reasonable jury could find in favor of Ekstrand's failure-to-accommodate claim.

## B. Constructive Discharge

To prevail on her claim for constructive discharge, Ekstrand must show "that a hostile work environment existed and 'that the abusive working environment became so intolerable that her resignation qualified as a fitting response.'" *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382-83 (7th Cir. 2005) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004)). A hostile work environment requires Ekstrand to show that the school district's conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment." *Suders*, 542 U.S. at 133 (citation omitted).

Ekstrand contends that she was constructively discharged because the school district refused to provide her with the requested classroom, refused to open the sick leave bank for her until she provided a more certain estimate of her leave time, and required her to turn in her keys and ID card when she stated her intentions to remain on leave for the rest of the school

year. But Ekstrand has not shown that the conditions of her employment even approached the intolerable levels normally required in constructive-discharge cases. *See Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge where the employee's boss consistently made racial comments and on one occasion held a gun to his head, took a photo, and later showed it at a staff meeting while making racial jokes); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (finding constructive discharge where the employee's human resource manager repeatedly showed her racist pornographic photos and made threatening comments to her including a threat to kill her). To the contrary, the record suggests that the school district made significant efforts to address Ekstrand's expressed concerns, for example by making many of Ekstrand's requested modifications to the classroom she was assigned. Moreover, Ekstrand remained employed while on leave until she tendered her resignation on July 9, 2007, and there couldn't have been a constructive discharge while the employment relationship continued. We therefore agree with the district court that summary judgment was proper for Ekstrand's constructive-discharge claim.

## III. CONCLUSION

For the reasons discussed above, we REVERSE the district court's grant of summary judgment on the failure-to-accommodate claim and AFFIRM the district court's grant of summary judgment on the constructive-discharge claim.

EVANS, *Circuit Judge*, concurring.  The typical ADA case involves the interests of two sides, the employer and the employee. We see lots of these cases. But our case today is not typical because the interests and concerns of others—the first-grade students and their parents—come into play. Although I join Judge Bauer's opinion for the court, I write separately to highlight a matter that should be considered when this case lands back in the lap of the district judge.

Teaching is a tough job. And teaching a class full of energized six- and seven-year-olds is particularly stressful. A lot is expected of teachers—by the administrators in the district and by the parents of the students.

From the sparse record in this case I assume that the School District of Somerset has high standards. Its Web site proclaims its motto: Learning Today to Succeed Tomorrow. In a district like this, parents quite naturally take an interest in who is teaching their children. And I can't imagine that many parents would be too pleased to have their first-graders in a classroom taught by a teacher who, to quote the court's opinion, suffered from "fatigue, anxiety, hypervigilance, tearfulness, racing thoughts, and trouble organizing tasks" plus "inability to concentrate . . . retrieve words, make decisions . . . focus on the needs of her students . . . hypersomnia . . . panic attacks, uncontrollable crying, inability to eat, and thoughts of suicide" in the fall of 2005. While I can imagine that an employer like UPS might be able to accommodate a delivery person with these kind of issues, I have a hard time understanding how a

school district could do the same for a first-grade teacher. This makes me wonder if Ms. Ekstrand, in the context of teaching, could ever establish that she was a *"qualified* individual with a disability" under the ADA in the fall of 2005 or that an accommodation that would be necessary to ameliorate her condition would be "reasonable." This issue deserves, I suggest, a close look on remand.